UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL TREASURY EMPLOYEES
    UNION,

        Plaintiff,

            v.                                          No. 1:25-cv-3948 (JDB)

U.S. OFFICE OF PERSONNEL
    MANAGEMENT,

        Defendant.

**DEFENDANT'S COMBINED REPLY IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

I.      RECORDS RESPONSIVE TO NTEU'S FOIA REQUEST ARE PROPERLY
PROTECTED UNDER EXEMPTION 5 ............................................................................ 2

        A.    Each Executive Branch Agency's Petition of Employee Positions
Recommended to be Transferred to Schedule Policy/Career is Pre-Decisional ........ 2

        B.    The Agency Petitions Are Pre-Decisional Inter-Agency Recommendations, Not
Records Applying Established Agency Standards ...................................................... 5

        C.    OPM Adequately Described that Foreseeable Harm that Would Result from
Disclosure of the Requested Records ....................................................................... 8

        D.    OPM's Articulations of Foreseeable Harm Withstand Scrutiny ............................. 12

        E.    OPM Demonstrated That It Cannot Segregate Non-Exempt Information .............. 14

CONCLUSION ................................................................................................................. 17

**TABLE OF AUTHORITIES**

**Cases**

*Am. First Legal Found. v. U.S. DOJ*,
   805 F. Supp. 3d 187 (D.D.C. 2025) ........................................................................... 13

*America First Legal Foundation v. U.S. Dep't of Agric.*,
   126 F.4th 691 (D.C. Cir. 2025) .................................................................................... 4

*Ancient Coin Collectors Guild v. U.S. Dep't of State*,
   641 F.3d 504 (D.C. Cir. 2011) .................................................................................... 10

*Army Times Publ'g Co. v. Dep't of Air Force*,
   998 F.2d 1067 (D.C. Cir. 1993) ............................................................................. 14, 15

*Assassination Archives & Research Center v. CIA*,
   781 F. App'x 11 (D.C. Cir. 2019), *opinion amended & superseded*,
   2020 WL 13120318 (D.C. Cir. 2020) ...................................................................... 6, 7

*Coastal States Gas Corp. v. Dep't of Energy*,
   617 F.2d 854 (D.C. Cir. 1980) .................................................................................. 5, 6

*Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*,
   436 F. Supp. 3d 90 (D.D.C. 2019) ........................................................................... 9, 11

*Energy Pol'y Advocs. v. SEC*,
   699 F. Supp. 3d 56 (D.D.C. 2023) .........................................................................................8, 12

*Jud. Watch, Inc. v. DOJ*,
   20 F.4th 49 (D.C. Cir. 2021).........................................................................................................9

*Jud. Watch, Inc. v. U.S. Dep't of Com.*,
   375 F. Supp. 3d 93 (D.D.C. 2019) ......................................................................................9, 11, 12

*Jud. Watch, Inc. v. U.S. DOJ*,
   No. 1:17-cv-0832, 2019 WL 4644029 (D.D.C. Sept. 24, 2019) ...............................................11, 13

*Juul Labs, Inc. v. FDA*,
   731 F. Supp. 3d 46 (D.D.C. 2024) ...........................................................................................14

*Laws.' Comm. for Civil Rights v. U.S. OMB*,
   No. 1:18-cv-645, 2023 WL 3433978 (D.D.C. May 12, 2023)...........................................................9

*Machado Amadis v. U.S. Dep't of State*,
   971 F.3d 364 (D.C. Cir. 2020)..............................................................................................9, 13

*Mapother v. DOJ*,
   3 F.3d 1533 (D.C. Cir. 1993)................................................................................................6, 7

*National Association of Minority Veterans v. U.S. Dept. of Veterans Affairs*,
   No. 1:21-cv-1298, 2024 WL 810032 (D.D.C. Feb. 27, 2024) ...................................................13, 14

*Nat'l Pub. Radio, Inc. v. DHS, 1:20-cv-2468*,
   2022 WL 4534730 (D.D.C. Sept. 28, 2022),
   *appeal dismissed per stip.*, No. 22-5311, 2023 WL 2717669 (D.C. Cir. Mar. 27, 2023)...........9, 10

*NLRB v. Sears, Roebuck & Co.*,
   421 U.S. 132 (1975)........................................................................................................................5

*Petroleum Info. Corp. v. U.S. Dep't of the Interior*,
   976 F.2d 1429 (D.C. Cir. 1992).................................................................................5, 14, 15, 16

*Quarles v. Dep't of the Navy*,
   893 F.2d 390 (D.C. Cir. 1990)..................................................................................................15

*Reporters Comm. for Freedom of the Press v. FBI*,
   3 F.4th 350 (D.C. Cir. 2021)..............................................................................................9, 13, 14

*Rudometkin v. United States*,
   140 F.4th 480 (D.C. Cir. 2025),
   *reh'g en banc denied*, 2025 WL 2212135 (D.C. Cir. Aug. 01, 2025).......................................8, 12

*Trans-Pac. Policing Agreement v. U.S. Customs Serv.*,
   177 F.3d 1022 (D.C. Cir. 1999)..........................................................................................14, 16, 17

*U.S. Dep't of the Interior v. Klamath Water Users Protective Ass'n*,
  532 U.S. 1 (2001) ................................................................................................3, 7, 14

*Vaughn v. Rosen*,
  523 F.2d 1136 (1975) ...........................................................................................6

**Statutes**

5 U.S.C. § 552 ......................................................................................................1

5 U.S.C. § 552(b)(5) ............................................................................................3

**Other Authorities**

*Implementing Schedule Policy/Career in the Excepted Service*, Exec. Order No. 14410,
  91 Fed. Reg. 34,893 (June 3, 2026) ....................................................................3

*Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce*,
  Exec. Order No. 14171, 90 Fed. Reg. 8625 (Jan. 20, 2025) ...............................3

*U.S. OPM, App'x 2: Questions & Answers on Schedule Policy/Career Final Regs., No. 10*,
  (updated June 8, 2026), https://perma.cc/U2EQ-3AY6 .......................................3

*U.S. OPM, Guidance on Implementing President Trump's Executive Order titled, "Restoring
  Accountability to Policy-Influencing Positions Within the Federal Workforce"*
  (Jan. 27, 2025, as updated June 3, 2026), https://perma.cc/727N-S4GV) ...........3

**INTRODUCTION**

The opening brief by Defendant, the U.S. Office of Personnel Management ("OPM"), established that it properly withheld from disclosure under Exemption 5 of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, all records responsive to the request by Plaintiff National Treasury Employees Union ("NTEU") for petitions received by OPM from other Executive Branch agencies identifying positions recommended by that agency to be ultimately transferred by the President into Schedule Policy/Career pursuant to the President's January 20, 2025, Executive Order to reform the Federal workforce. *See generally* Def.'s Mot. for Summ. J., ECF No. 21. OPM demonstrated that the records are confidential, pre-decisional, interagency recommendations, that factual material contained within the records reflects each agency's judgment about which employee positions to recommend for transfer, and that the foreseeable harm from disclosure of these records would undermine the Executive Branch's deliberative decision-making processes. *See id*. at 7–16.

NTEU contends that the withheld records are not pre-decisional and are not deliberative because the agencies, according to NTEU, were merely carrying out Presidential and OPM directives. See Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. & in Supp. of Pl.'s Cross-Mot. for Summ. J., at 5-8, ECF No. 25-1 ("Pl.'s Mem."). But OPM's declaration and *Vaughn* index establish that the agencies' submissions to OPM were draft, confidential, pre-decisional interagency recommendations by each agency to OPM of positions that OPM, in turn, recommended to the President that he transfer to Schedule Policy/Career. NTEU also contends that OPM cannot rely on the same explanation of the foreseeable harm that would result from the disclosure of each responsive record. *See id*. at 8–10. But NTEU ignores the fact that it requested the same type of record from each agency. NTEU further contends that OPM failed to show how disclosure would cause foreseeable harm to the Executive Branch's decision-making process and challenges the notion that public confusion is a recognized form of foreseeable harm. *See id*. at 10-12. But, especially in light of the records at issue, the foreseeable harm that would result from

disclosure of these records is manifest and amply articulated, and NTEU's challenge to OPM's showing of public confusion is meritless. Finally, NTEU challenges OPM's showing that no portion of the records are segregable. *See id*. at 12–14. But OPM demonstrated that the records at issue consist of each agency's selection of each position recommended for consideration reflects the confidential, pre-decisional, deliberations of that agency as well as the interagency deliberations between that agency and OPM, and that the lists contained no other information. OPM has shown enough.

This Court should thus grant summary judgment to Defendant and deny Plaintiff's cross motion for summary judgment.

## ARGUMENT

### I.   RECORDS RESPONSIVE TO NTEU'S FOIA REQUEST ARE PROPERLY PROTECTED UNDER EXEMPTION 5

OPM properly withheld in full the records responsive to NTEU's request under Exemption 5 of the FOIA because each record consists of confidential, pre-decisional interagency recommendations from agencies to OPM, which will themselves be inputted into recommendations to the President, each of which is protected by the deliberative process privilege. *See* Def.'s Mot. at 11–13. OPM adequately demonstrated the foreseeable harm to the Executive Branch's decision-making process that would result from disclosure of the withheld records, *see id*. at 13–14, and established that no portion of the responsive records were segregable, *see id*. at 14–15. Each of NTEU's challenges asserting the contrary is without merit.

### A.   Each Executive Branch Agency's Petition of Employee Positions Recommended to be Transferred to Schedule Policy/Career is Pre-Decisional

Contrary to NTEU's contention, *see* Pl.'s Mem. at 5-6, each Executive Branch agency's petition of employee positions recommended to be transferred to Schedule Policy/Career is a pre-decisional recommendation to OPM, not a final agency decision. In advancing its view, NTEU misapprehends the deliberative process itself and the decision at issue in this case.

First, on its face, Exemption 5 applies both to "*inter-agency* or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency[.]" 5 U.S.C. § 552(b)(5) (emphasis added); *U.S. Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 9 (2001). Thus, whether a record responsive to NTEU's request is the final recommendation that an Executive Branch agency made to another agency does not undermine the proper application of Exemption 5 to that record.

Second, as NTEU itself effectively concedes, the decision at issue in this case is the President's decision about which agency employee positions to actually transfer to Schedule Policy/Career. *See* Pl.'s Mem.at 3 (citing *Implementing Schedule Policy/Career in the Excepted Service*, Exec. Order No. 14410, 91 Fed. Reg. 34,893 (June 3, 2026)) ("June 2026 Executive Order"); *see also id*. at 11 (acknowledging that the decision at issue is the "final presidential determination."). Based on OPM's recommendation to the President, that document reflects the President's final decision about each agency position that he has "placed into Schedule Policy/Career of the Excepted Service." June 2026 Executive Order, App'x A, at 1. And the President may still transfer positions into or out of Schedule Policy/Career. *See* U.S. OPM, App'x 2: Questions & Answers on Schedule Policy/Career Final Regs., No. 10 at 5-6 (updated June 8, 2026), https://perma.cc/U2EQ-3AY6 ("positions may be converted to Schedule Policy/Career at a later date if the circumstances of the position warrant it."); *see also id*., No 12 at 6 (noting that agencies can petition the President to take a position out of Schedule Policy/Career). Moreover, another document that NTEU cites clarifies the role played by each agency in making recommendations to OPM of which positions to transfer to Schedule Policy/Career, and OPM in turn, made recommendations to the President. *See* Pl.'s Mem. at 2 (citing U.S. OPM, *Guidance on Implementing President Trump's Executive Order titled,* "*Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce*" (Jan. 27, 2025, as updated June 3, 2026), https://perma.cc/727N-S4GV) ("January 2025 Guidance")); *see also Restoring Accountability to Policy-Influencing Positions Within the Federal Workforce*, Exec. Order No. 14171, 90 Fed. Reg.

8625 (Jan. 20, 2025) ("January 2025 Executive Order") (directing OPM, "after consultation with the Executive Office of the President, [to] issue guidance about additional categories of positions that executive departments and agencies should consider *recommending* for Schedule Policy/Career.") (emphasis added). OPM's January 2025 Guidance explained that the President's January 2025 Executive Order had instructed each agency to submit to OPM within 90 days "*interim recommendations* on positions appropriate to be placed into Policy/Career." January 2025 Guidance at 5 (emphasis added). That sentence alone is enough to rebut NTEU's assertion that agency petitions are final decisions. In any event, the *Vaughn* index of the records OPM withheld reinforce this conclusion. The index shows each agency's initial and repeated revised submissions of lists of employee positions recommended to be transferred to Schedule Policy/Career, reflecting the ongoing, inter-agency exchange of ideas about which employee positions to recommend for transfer. *See* Ex. A to Decl. of Tonya Carrington, ECF No.22-3.

This is very similar to the records at issue in A*merica First Legal Foundation v. U.S. Department of Agriculture*, 126 F.4th 691 (D.C. Cir. 2025). In that case, the plaintiff sought records withheld under Exemption 5 that had been created by agencies in response to an Executive Order. *See id*. at 694. The plaintiff challenged the withholding of agency records on the grounds that each agency's records "were not inputs into presidential deliberations and decisionmaking, but instead documented 'actions to be taken by each agency, independent of any decisionmaking or deliberation by the President.'" *Id*. at 696 (citation omitted). The Court of Appeals rejected the plaintiff's claims and found that the Executive Order's request to each agency "[wa]s naturally read as instructing agencies to think through and describe for the White House the steps they could take to further the President's stated policy goals, so that the President and his advisors could consider next steps." *Id*. This Court should reach the same conclusion about the records at issue here and should thus reject NTEU's contention that each agency's recommendation of employee positions to be transferred to Schedule Policy/Career was a final agency decision that cannot be withheld under Exemption 5.

**B.      The Agency Petitions Are Pre-Decisional Inter-Agency Recommendations, not Records Applying Established Agency Standards**

This Court should reject NTEU's contention that it is entitled to the withheld records because they are not deliberative. *See* Pl.'s Mem. at 6-8. In advancing this assertion, NTEU makes two overlapping claims. First, NTEU continues to claim that the agency petitions are not pre-decisional but merely reflect or implement Schedule Policy/Career. *See* Pl.'s Mem. at 6-7 (citing, *e.g.*, *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975); *Petroleum Info. Corp. v. U.S. Dep't of the Interior*, 976 F.2d 1429 (D.C. Cir. 1992); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980)). Each case cited by NTEU is easily distinguished, especially since NTEU points to the wrong Executive Branch decision that is at issue here.

In *Sears*, the Supreme Court addressed a FOIA request for advice and appeals memoranda issued by the General Counsel of the NLRB generated in the court of deciding whether to permit the filing of an unfair labor practice complaint. *See* 421 U.S. at 136. The Court found that "[c]rucial to the decision of this case is an understanding of the function of the documents in issue in the context of the administrative process which generated them." *Id*. at 138. After reviewing the agency processes at issue, the Court held that the requested documents were not final opinions made in the adjudication of a case such that they fell outside the scope of Exemption 5. *See id*. at 148. In reaching the holding, the Court drew a sharp distinction between pre- and post-decisional documents, *see id*. at 151–52, and characterized certain documents that explain the basis for a decision already made by an agency as the "'working law' of the agency." *Id*. at 153. But the documents at issue in the present dispute cannot reasonably be characterized as the "working law" of each agency. As directed by the President and OPM, they are instead each agency's initial and revised recommendations of employee positions to be transferred to Schedule Policy/Career. *See* Carrington Decl. ¶ 9. As a result, NTEU's reliance on *Sears* does not advance its case.

Nor does *Coastal States Gas* support NTEU's position. In that case, the Court of Appeals addressed a FOIA request for non-public agency interpretations of its regulations. *See* 617 F.2d at 857. The court explained that documents protected by the deliberative process privilege "are those

5

which would inaccurately reflect or prematurely disclose the views of the [Executive Branch]." *Id*. at 866. Applying that standard to the documents sought by the plaintiff, the court found that they "were not suggestions or recommendations as to what agency policy should be … [we]re not advice to a superior, nor [we]re they suggested dispositions of a case." *Id*. at 868. And critically, they did not "reflect 'agency give-and-take of the deliberative process by which the decision itself is made.'" *Id*. (quoting *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (1975)). Additionally, the court found that disclosure of the requested records would not mislead the public but were "routinely used by agency staff as guidance in conducting their audits, and were retained and referred to as precedent." *Id*. at 869. Here, by contrast, the documents sought by NTEU directly reflect inter-agency give-and-take of the deliberative process of which employee positions to recommend to the President by placed into Schedule Policy/Career, *see* Carrington Decl. ¶ 9, and their disclosure would cause public confusion, *see id*. ¶ 10. Nor is there any basis to support NTEU's suggestion that they are used as guidance or referred to as precedent. *Coastal States Gas* is thus distinguishable.

This Court should also reject NTEU's attempt to distinguish *Assassination Archives & Research Center v. CIA*, 781 F. App'x 11 (D.C. Cir. 2019), *opinion amended & superseded*, 2020 WL 13120318 (D.C. Cir. 2020). *See* Pl.'s Mem. at 7. NTEU's chief complaint appears to be that the Court of Appeals in that case did not rule on the applicability of Exemption 5 to the exact records at issue in present dispute. *See id*. But the Court of Appeals affirmed that that the deliberative process privilege applies to pre-decisional records that "'reflect[] the give-and-take' of a 'consultative process,'" *Assassination Archives & Rsch. Ctr.*, 781 F. App'x at 13 (citation omitted), and applies to "factual material … assembled through an exercise of judgment in extracting pertinent material from a vast number of documents for the benefit of an official called upon to take discretionary action," *id*. (quoting *Mapother v. DOJ*, 3 F.3d 1533, 1539 (D.C. Cir. 1993)). Applying those standards to the records at issue there, the court held that "the redacted matter amounted to pre[-]decisional communications from staff made for the purpose of informing

6

the agency's ultimate decision." *Id*. at 13–14. That is exactly the case here.

Again, contrary to NTEU's contention, the decision at issue in this case is *not* the President's January 2025 Executive Order or OPM's January 2025 Guidance; the decision at issue in this case is the President's June 2026 Executive Order actually placing certain Executive Branch agency positions into Schedule Policy/Career. *See* Carrington Decl. ¶ 9; *see also generally* June 2026 Executive Order, App'x A. And, as noted above, the President may transfer additional positions to Schedule Policy/Career. *See supra* at 3. As a result, the documents at issue here are clearly confidential, pre-decisional recommendations to OPM about which positions to recommend to the President. *See* Carrington Decl. ¶ 9.

This Court should also reject NTEU's contention that OPM's role in these Executive Branch deliberations "reflect mechanical criteria-checking." Pl.'s Mem. at 6-7 n.1. Contrary to NTEU's suggestion, the withheld records "reflect recommendations and revisions between the submitting agencies and OPM." Carrington Decl. ¶ 9. As reflected in OPM's *Vaughn* index, "the lists of recommended positions from agencies have been updated and revised numerous times and are still being revised," and OPM has, in turn, "update[d] its concurrence determinations." *Id*. The agency also explained that "each agency's initial and revised selections of those positions that reflects the confidential pre-decisional deliberations of that agency as well as the interagency deliberations between that agency and OPM." *Id*. ¶ 11. And, most critically, OPM stated that after it has reviewed these records, it "will submit recommendations, and the President will make the final decision of what positions to designate for Schedule Policy/Career." *Id*. ¶ 9. As a result, OPM was engaged in deliberative judgment about which positions to recommend to the President, and NTEU fails to show that OPM's role in overseeing this process is not part of a deliberative process. Accordingly, this Court should reject NTEU's challenge to OPM's showing that the records at issue are protected by the deliberative process privilege.

7

**C.      OPM Adequately Described that Foreseeable Harm that Would Result from Disclosure of the Requested Records**

This Court should reject NTEU's challenge to the adequacy of OPM's showing of the harm that would foreseeably result if the requested records were disclosed. *See* Pl.'s Mem. at 9–10. OPM adequately explained its determination that disclosing records involved in agency recommendations that would lead to Presidential decisionmaking would reveal information about the nature and scope of each of the agencies' intra-agency deliberations as well as OPM's intra-agency and interagency deliberations about which positions to recommend to the President be transferred to Schedule Policy/Career. *See* Carrington Decl. ¶ 10. Specifically, OPM explained that, if agency and OPM employees knew that the specific information they assembled for the President would later be disclosed to the public, they would be less likely to provide candid recommendations regarding which positions to designate for Schedule Policy/Career. *See id.* OPM further explained that identifying such positions would undermine the confidential, intra-agency and interagency decisionmaking mechanisms that the deliberative process privilege is designed to protect, *see id.*, and would thus impair OPM's ability to foster forthright, internal discussions necessary for efficient and proper agency and Presidential decision-making, *see id.* OPM therefore adequately explained that such an intrusion into OPM's non-final deliberations is precisely the harm against which the deliberative process privilege protects. *See id.*; *cf. Energy Pol'y Advocs. v. SEC*, 699 F. Supp. 3d 56, 65–66 (D.D.C. 2023) (holding that an agency's similar level of explanation of future harm was not "generalized" or "boilerplate." Rather, it [wa]s similarly focused and concrete as explanations of harm that other courts have found adequate.") (collecting cases).

Especially in light of the sensitive nature of the records sought by NTEU, OPM's description of the foreseeable harm that would result disclosure of the responsive records is more than enough. *See Rudometkin v. United States*, 140 F.4th 480, 493 (D.C. Cir. 2025) ("even when an agency's declaration falls short of th[is court's foreseeable harm] standard, we will uphold the agency's withholding of documents in rare situations when 'the record establishes the unique

sensitivity' of those documents, such that 'the foreseeability of harm [is] manifest' from the 'very context and purpose' of the documents.") (citations omitted), *reh'g en banc denied,* 2025 WL 2212135 (D.C. Cir. Aug. 01, 2025); *Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020) (holding agency affidavit adequately explained that disclosure of internal attorney work product would "discourage line attorneys from candidly discussing their ideas … thus impairing the forthright internal discussions necessary for efficient and proper adjudication of administrative appeals." (citations omitted)); *Laws.' Comm. for Civil Rights v. U.S. OMB*, No. 1:18-cv-645, 2023 WL 3433978, at *9 (D.D.C. May 12, 2023) (finding agency's *Vaughn* index adequately explained that disclosure of inter- and intra-agency deliberative communications would "inhibit OMB's ability to have frank and open discussions on policy matters with other parts of the Executive Branch.").Thus, OPM's declaration "directly articulated "[a] link between the specified harm and the specific information contained in the material withheld." *Reporters Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 371 (D.C. Cir. 2021) (quoting H.R. Rep. No. 391, 114th Cong., 2d Sess. 9 (2016)). And taken together, the agency's declaration and *Vaughn* index adequately identify the "'who,' *i.e.*, the roles of the document drafters and recipients and their places in the chain of command; the 'what,' *i.e.*, the nature of the withheld content; the 'where,' *i.e.*, the stage within the broader deliberative process in which the withheld material operates; and the 'how,' *i.e.*, the way in which the withheld material facilitated [Executive Branch] deliberation." *Jud. Watch, Inc. v. DOJ*, 20 F.4th 49, 56 (D.C. Cir. 2021).

Ignoring the very nature of the records that NTEU requested, *see* Pl.'s Mem. at 3 (characterizing its request as "narrow"), NTEU challenges OPM's supposed failure to separately identify the unique harm that would foreseeably result from disclosure of each and every withheld document, *see id*. at 9–10 (citing *Nat'l Pub. Radio, Inc. v. DHS*, No. 1:20-cv-2468, 2022 WL 4534730 (D.D.C. Sept. 28, 2022) ("NPR"), *appeal dismissed per stip.*, No. 22-5311, 2023 WL 2717669 (D.C. Cir. Mar. 27, 2023); *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 105 (D.D.C. 2019); *Jud. Watch, Inc. v. U.S. Dep't of Com.*, 375 F. Supp.

9

3d 93 (D.D.C. 2019)). Each case cited by NTEU is distinguishable.

In *NPR*, the court addressed a request for records seeking all inspection and investigative reports of immigration detention facilities over a five-year period. *See* 2022 WL 4534730, at *1. NPR challenged DHS's withholding of substantial portions of responsive records under Exemption 5. *See id.* at *4. The court found that, while the withheld information was pre-decisional, much of it was "too factual" to be deliberative. *Id*. In reaching that conclusion, the court explained that the deliberative process privilege applies to factual information that "reflects an exercise of discretion and judgment calls[,]" *id*. at *5 (quoting *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011)), and that information is deliberative if "the selection or organization of facts is part of [the] agency's deliberative process[,]" *id*. (citation omitted). Applying that standard to the records at issue there, the court found that the agency's "unverified observations of first impression" did not reflect agency deliberations, *id*. at *6, because, for example, the gathering of purely factual information did not involve "discretion and judgment calls," *id*. Having found that the information was not deliberative, the court also found that the agency's claims of foreseeable harm that would result from the disclosure of the information was "boilerplate," *id*. at *7, because it failed to explain why disclosure of these specific types of reports would chill deliberations, *see id*. at *8. In the present matter, by contrast, each agency's initial selection and revisions of employee positions recommended to be transferred to Schedule Policy/Career were part of the Executive Branch's deliberative process. *See* Carrington Decl. ¶ 10. Moreover, OPM adequately demonstrated that, if agency and OPM employees knew that the specific information they assembled for the President would later be disclosed to the public, they would be less likely to provide candid recommendations regarding which positions to designate for Schedule Policy/Career. *See id.*. Indeed, OPM specifically determined that identifying such initial and revised recommendations of positions would impair OPM's ability to foster forthright, internal discussions necessary for efficient and proper agency and Presidential decisionmaking. *See id*. OPM's demonstration of foreseeable harm is thus

distinguishable from *NPR*.

*Center of Investigative Reporting* is also distinguishable. In that case, the plaintiff submitted a FOIA request for "all submissions, records, documents, white papers, memoranda and/or alike material related to border fence/border wall contract proposals." 436 F. Supp. 3d at 96 (citation omitted). The agency withheld a wide variety of records, including

> the interagency acquisitions supplement, best procurement approach for assisted acquisitions document, terms and conditions for assisted acquisitions document, border wall funding spreadsheets, interagency agreements, proposed responses to Congressional questions with edits, draft border wall communication and outreach strategy plan and outline, internal white paper documents pertaining to acquiring prototype wall designs, schedules pertaining to border wall matters, an internal risk register, [and] U.S. Border Patrol facilities and tactical infrastructure and Air and Marine PMO wall project requirement document[s].

*Id*. at 100 (citation omitted). Having first found that the agency failed to identify any decision-making process to which the documents might be related, *see id*. at 102–03, the court found also that, despite the wide variety of responsive records, the agency admitted that it applied a "general statement" about foreseeable harm descriptions to every type of record, *id*. at 107. The court held that, if the agency "wish[ed] to establish foreseeable harm when they supplement the record, [it] w[ould] need to provide 'context or insight into the specific decision-making processes or deliberations at issue, and how they in particular would be harmed by disclosure.'" *Id*. at 107 (quoting *Jud. Watch, Inc. v. U.S. DOJ*, No. 1:17-cv-0832, 2019 WL 4644029, at *3 (D.D.C. Sept. 24, 2019)). The court thus gave the agency another opportunity to establish foreseeable harm. *See id*. at 115. Here, by contrast, OPM has established that the withheld records are exempt and, given the nature of the records at issue, has adequately described the foreseeable harm to Executive Branch decision making that would result from their disclosure.

*Judicial Watch* is similarly distinguishable. In that case, the court addressed a request for records of communications between an agency scientist and an agency component director. *See* 375 F. Supp. 3d at 95. The court held that the agency failed to articulate "a link between the specified harm and the specific information contained within the material withheld," *id*. at 100 (citation omitted), but nevertheless allowed the agency to supplement its declaration on remand to

11

satisfy the foreseeable harm requirement, *see id.* at 101. In the present dispute by contrast, especially in light of the nature of records at issue, OPM has adequately described the reasonably foreseeable harm to the Executive Branch's deliberative process that would result from their disclosure. *Cf. id.*

This Court should also reject NTEU's contention that OPM improperly treated each agency's initial list, revised lists, and any supporting materials the same. *See* Pl.'s Mem. at 9. NTEU specifically requested that OPM disclose "all [agency] petitions received by [OPM] from all agencies identifying positions … to be transferred into Schedule Policy/Career[.]" Am. Compl., ECF No. 18, at Ex. A at 3. NTEU thus requested that OPM produce the *same* information received from each of 74 Executive Branch agencies. Thus, the lists are functionally identical in the role they play in Executive Branch deliberations about what positions the President has transferred or may still transfer to Schedule Policy/Carrer. As a result, the notion that OPM could somehow describe a foreseeable harm resulting from disclosure of one agency's submissions that would be different from the resulting harm from disclosure of another agency's submissions is unrealistic. So, too, is NTEU's suggestion that the harm that would result from disclosure of each agency's initials list would somehow be different than would result from disclosure of revised lists or any supporting documentation.

D.    **OPM's Articulations of Foreseeable Harm Withstand Scrutiny**

This Court should reject NTEU's challenge to OPM's articulation of the foreseeable harm that would result from disclosure of the withheld records. *See* Pl.'s Mem. at 10–11.

First, NTEU cherry-picks a fragment of OPM's showing of the foreseeable harm that would result from disclosure of the withheld information and asserts that OPM is "recycle[ing] the deliberative argument already addressed," rather than making a separate showing of harm. Pl.'s Mem. at 10. But NTEU's challenge ignores OPM's full showing and seeks to hold the agency to a higher standard than the courts have required of other agencies in similar situations. *See, e.g., Rudometkin*, 140 F.4th at 493; *Energy Pol'y Advocs.*, 699 F. Supp. 3d at 65–66.

12

Second, NTEU contends that OPM has failed to adequately explain how disclosure would inhibit candid recommendations of agency employees. *See* Pl.'s Mem. at 10. But OPM adequately explained that if agencies employees knew that their confidential, pre-decisional, recommendations would be made public, their resulting lack of candor would impair OPM's ability to foster forthright, internal discussions necessary for efficient and proper agency and Presidential decision-making. *See* Carrington Decl. ¶ 10. Especially in light of the nature of the documents at issue here, the harm from such disclosure is manifest. *Cf. Machado Amadis*, 971 F.3d at 371.

This Court should thus reject NTEU's reliance on *National Association of Minority Veterans v. U.S. Dept. of Veterans Affairs*, No. 1:21-cv-1298, 2024 WL 810032 (D.D.C. Feb. 27, 2024). *See* Pl.'s Mem. at 10. There, the court addressed a request for agency responses to an Inspector General report and two agency spreadsheets withheld under Exemption 5. *See* 2024 WL 810032 at *1. The court found that the agency had not shown how disclosure would cause employees to "limit and edit their communication," *id*. at *7 (citation omitted), and failed to explain the sensitivity of the types of information at issue or the role they play in the relevant agency decision process, *see id*. In the present matter, by contrast, OPM has adequately explained the role that these communications play in the Executive Branch's and the President's decision-making process such that "the foreseeable harm criterion may be deemed satisfied, even without a detailed agency justification, if the context and purpose' of the withheld information support such a conclusion." *Am. First Legal Found. v. U.S. DOJ*, 805 F. Supp. 3d 187, 214 (D.D.C. 2025) (quoting *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 372 (D.C. Cir. 2021)).

Third, NTEU challenges OPM's explanation of the public confusion that would foreseeably result from disclosure of the withheld records. *See* Pl.'s Mem. at 11. This Court should reject NTEU's absurd contention that no public confusion could result from disclosure of each agency's confidential, pre-decisional interim and revised recommendation simply because the President's January 2025 Executive Order and OPM's January 2025 Guidance are public, as the

13

confidential pre-decisional documents consist of detailed lists of agency employee positions that have not been disclosed in any publicly-available documents. This Court should also reject NTEU's assertion that no public confusion can result from disclosure of information developed after an "agency decision has already been made." *Id*. (quoting *Nat'l Ass'n of Minority Veterans*, 2024 WL 810032, at *8). NTEU again misapprehends the decision at issue in this case. As noted above, *see supra*, at 3-4, the relevant Executive Branch decisions are OPM's final recommendation to the President and the President's June 2026 Executive Order, both of which post-date the information at issue in this case, as well as any future decision the President may make transferring positions into or out of Schedule Policy/Career. Similarly, this Court should reject NTEU's assertion that OPM is only relying on public confusion as its sole articulated basis of foreseeable harm that would result from disclosure. *See* Pl.'s Mem. at 11 (citing *Nat'l Ass'n of Minority Veterans*, 2024 WL 810032, at *8). But public confusion is only one aspect of the harm that OPM has articulated. *See* Carrington Decl. ¶ 10. NTEU's attempt to distinguish OPM's reliance on *Juul Labs, Inc. v. FDA*, 731 F. Supp. 3d 46 (D.D.C. 2024), *see* Pl.'s Mem. at 11–12, thus fails. This Court should thus reject NTEU's challenge to the adequacy of OPM's showing of the foreseeable harm that would result from the disclosure of the records at issue here.

### E.  OPM Demonstrated That It Cannot Segregate Non-Exempt Information

OPM reasonably determined that there is no segregable portion of the agencies' initial draft lists, revised draft lists, or other material concerning employee positions recommended to be transferred to Schedule Policy/Career because it was each agency's selection of each position recommended for consideration reflects the confidential, pre-decisional, deliberations of that agency as well as the interagency deliberations between that agency and OPM and the lists contained no other information. *See* Carrington Decl. ¶ 11.

NTEU challenges OPM's determination on the grounds that the agency failed to make a sufficient showing. *See* Pl.'s Mem.at 12–14 (citing *Army Times Publ'g Co. v. Dep't of Air Force*, 998 F.2d 1067, 1071 (D.C. Cir. 1993); *Petroleum Info. Corp.*, 976 F.2d at 1434–35; *Trans-Pac.*

14

*Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999)). Each case is distinguishable.

In *Army Times*, the requester sought records of agency survey results. *See* 998 F.2d at 1068. The court found that while the survey results were pre-decisional, the agency had "selectively release[d]" similar survey results to the public and routinely provided the results to agency command, *see id*. at 1070, and therefore it could not show that release of the records at issue would cause a chilling effect on the survey respondents' candor, *see id*. at 1071–72; *see also id.* at 1071 (also noting that the survey results appeared to be about routine matters like the use of local commissaries). The court also found that the agency's segregability analysis had failed to provide enough detail for a court to "discern a basis for distinguishing between the 'innocuous' material and that which is potentially harmful." *Id*. The court thus remanded so the agency could make more detailed showings. *See id*. at 1072. In the present case, by contrast, no agency has selectively released its pre-decisional selection of employee positions recommended to be transferred to Schedule Policy/Career, nor is there any basis for concluding that the agency needs to demonstrate that the selection of some positions recommended for transfer might be "innocuous" while other recommendations might potentially harmful. *Army Times* is thus inapposite.

*Petroleum Information* is also distinguishable. There, the court addressed a request for factual records from an agency database. *See* 976 F.2d at 1431. The court found that its decisions "caution against reflexive fact/opinion characterization as the way to decide the full range of Exemption 5 cases" and that, to be protected by the deliberative process privilege, the materials at issue turn on whether they "bear on the formulation or exercise of agency policy-oriented *judgment*." *Id*. at 1435 (citing *Quarles v. Dep't of the Navy*, 893 F.2d 390, 392–93 (D.C. Cir. 1990)). Applying that standard, the court found that the records at issue were not deliberative because they were not confidential and because they lacked association with a significant policy decision. *See id*. at 1437. In reaching that conclusion, the court found that "[t]his is not a case in

15

which an agency has winnowed a mass of information into a small set of facts which, if revealed, would unveil the agency's reasoning by showing what it considered relevant (and irrelevant)." *Id*. at 1438. Here, in contrast, each initial list and revised lists of agency employee positions recommended for transfer to Schedule Policy/Career are confidential, pre-decisional interagency recommendations, and OPM has adequately demonstrated that each agency and OPM exercised judgment in determining which positions should be considered for designation. *See* Carrington Decl. ¶ 9. OPM additionally demonstrated that revealing the recommended positions would expose what the agencies and OPM considered to be pertinent prior OPM making a final recommendation to the President, which is the exact type of information the deliberative process privilege protects. *See id*. ¶ 10.

Nor is there any basis to NTEU's complaint that OPM failed to adequately explain that each document contained no segregable information. *See* Pl.'s Mem. at 12–14. NTEU characterizes OPM's *Vaughn* index as identifying "spreadsheets, transmittal emails, and separately submitted position-description documents." *Id*. at 13. But OPM explained that every responsive record "consist[s] of confidential, pre-decisional opinions, recommendations, and deliberations from agencies for employee positions to be placed into Schedule Policy/Career." Carrington Decl. ¶ 9. OPM further explained that "the lists of recommended positions from agencies have been updated and revised numerous times and are still being revised." *Id*. OPM thus reasonably determined that "no portion of the responsive records could be reasonably segregated to allow for the disclosure of any non-exempt information because it was each agency's initial and revised selections of those positions that reflects the confidential pre-decisional deliberations of that agency as well as the interagency deliberations between that agency and OPM." *Id*. ¶ 11. Indeed, even if OPM could somehow redact the job titles from each of the agency lists of positions descriptions, it would still be possible to identify the positions each agency recommended and thus would be the functional equivalent of just releasing the lists. In light of this showing, NTEU's reliance on *Trans-Pacific Policing Agreement*, 177 F.3d 1022, *see* Pl.'s Mem. at 14, is simply

16

inapposite, as that court remanded the case to the district court because the district court had made *no* segregability determination. *See Trans-Pac. Policing Agreement*, 177 F.3d at 1028. This Court should thus reject NTEU's challenge to OPM's segregability determination.

## CONCLUSION

This Court should grant Defendant's motion for summary judgment, deny Plaintiff's cross motion for summary judgment, and enter judgment for Defendant.

Dated: July 16, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Branch Director

*s/ James D. Todd, Jr.*
JAMES D. TODD, JR.
Senior Trial Counsel
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
Ben Franklin Station
P.O. Box 883
Washington, DC 20044

*Attorneys for Defendants*

17